1

2

3

4

5

6

7

8

9

10

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOHN A. GILLIES, | ) | No. C 11-02097 EJD (PR) |
| Petitioner, | ) ) | **ORDER DENYING PETITION FOR** |
| v. | ) ) | **WRIT OF HABEAS CORPUS;** **DENYING CERTIFICATE OF** |
| | ) ) | **APPEALABILITY** |
| G. SWARTHOUT, Warden, | ) ) | |
| Respondent. | ) ) | |
| | ) | |

Petitioner has filed a <u>pro se</u> petition for a writ of habeas corpus under 28

U.S.C. § 2254 challenging his state conviction from Lake County Superior Court.

For the reasons set forth below, the Petition for a Writ of Habeas Corpus is

**DENIED**.

## BACKGROUND

Petitioner was found guilty by a jury of kidnaping during the commission of a

carjacking (Pen. Code § 209.5, subd. (a)),[1] and robbery in the second degree (§ 211).

The jury also found true the allegation that Petitioner had personally used a firearm

in the commission of the offenses (§§ 12022.5, subd. (a), 12022.53, subd. (b)).

---

[1] All further unspecified statutory references are to the California Penal Code.

1    Petitioner was sentenced to an aggregate term of 23 years to life in state prison, with

2    parole eligibility after 30 years.

3    Petitioner filed a direct appeal and a petition for writ of habeas corpus.  The

4    California Court of Appeal consolidated the matters, affirmed the conviction, and

5    summarily denied the habeas petition on December 31, 2009.  The state high court

6    denied review on April 14, 2010.  Petitioner filed the instant federal habeas petition

7    on April 28, 2011.

8                                **FACTUAL BACKGROUND**

9    The following facts are taken from the opinion of the California Court of

10   Appeal:

11           The charges of which defendant was convicted arose from
     two incidents that took place during the early mornings of Monday,
12   November 6, 2006. First, a masked gunman carjacked and kidnapped
     Patrick Brown, and then shortly thereafter, the masked gunman
13   robbed the Twin Pine Casino.

14           *A.      Prosecution's Case*

15           In the early morning hours of November 6, 2006, Patrick
     Brown drove a company truck and stopped at a car wash before
16   going to work at a construction site. While washing the truck, Brown
     was approached by a man, about 6 feet tall and dressed in a cape
17   with a hood on it, and a black face mask that looked like a fencing
     mask. Brown could not tell the man's race or hair color. The man
18   pulled out a gun and told Brown to get into the truck. Brown initially
     said, no, but when the man again told Brown to get into the truck he
19   complied. Pointing the gun at Brown, the man told Brown to drive in
     the direction of Dry Creek.

20
             When Brown reached the Dry Creek cutoff, the man insisted
21   that Brown drive down a dirt road toward a wooded area. Brown
     refused to drive any further, and told the man to take the truck and
22   let him out. Brown got out of the truck and the man eventually drove
     away.
23
             Brown ran along the road until he was able to flag down a
24   Jeep. Todd Braget and his girlfriend were in the Jeep. Brown
     explained that a man wearing a mask and carrying a gun had stolen
25   his truck. Braget told Brown to get into the Jeep, and suggested they
     go to the casino where they would look for the truck. As the Jeep
26   neared the Twin Pine Casino, Brown saw his truck stopped outside
     the casino.
27
             As they entered the casino parking lot, Braget and Brown saw
28   people running out of the casino, saying the casino was being

robbed. The Jeep stopped in the parking stall next to Brown's truck, and Braget got out and went towards Brown's truck. Braget saw a man, whom he later identified as defendant, dressed in a mask, carrying a gun and something else under his arm, running towards Brown's truck. Braget also saw that the man had what appeared to be "a hood or something with a pink or purple strip of cloth around the front of the face of it." Just before he jumped into the truck and within a second, defendant was able to pull his hood down and pull off the mask and discard it on the ground. [FN4] Defendant removed the mask with his left hand; keeping the gun in his right hand; and the other items under one of his arms. The mask that Braget saw fall to the ground was all black and did not have any purple or pink border on it. As defendant drove off, Braget ran alongside the truck and hit the driver's side windshield with his hand. There was a loud smash that caused defendant to move to the passenger side, and when he realized the window was still intact, defendant, who looked scared, moved back into the driver's seat and drove away. The parking lot was well lit, and Braget was able to get a good look at defendant's face inside the cab of the truck.

FN4. Two videos were created using tapes from several casino surveillance cameras. Braget testified that the portion of the video where defendant pulled the mask off, right before he opened the truck door, took "about a second," and "was pretty fast."

When the truck drove off, Braget ran back to his Jeep and pursued defendant. After traveling for awhile, Braget realized he had lost sight of Brown's truck and he drove back to the casino. Later that day, the police found Brown's truck parked behind a store opposite the car wash where the carjacking began.

About three months before the May 2008 trial, California Department of Justice Special Agent Clyde Raborn showed Braget a six-man photographic array. Even though Braget was told the suspect might not be in the lineup, as soon as Braget looked at the array, he pointed right to the person in position three (defendant) and said, "[T]hat's the guy." The officer who showed Braget the photographic array did not promise him any reward or benefit for identifying any particular individual, nor was Braget threatened in any way to get him to identify anyone. Braget also identified defendant in court.

Several casino employees testified concerning the casino robbery, including cash cage supervisor Dorothy Davis, security guards Alvin Carlisle, Jr., Tarvis Parker, John Thompson, and graveyard security supervisor Roland Young. In the early morning hours of November 6, 2006, a man dressed in a cape and face mask entered the Twin Pines Casino. He ran through the front door, and when he reached the cash cage, he said, "Give me all your money." Supervisor Davis, who was working inside the cash cage, thought the man was joking and said, "No." The man pulled out a gun, pointed it at Davis and said, "Hurry up, come on, bitch, hurry up." Davis gave the man a cash drawer containing $23,504. The money was never recovered or traced to defendant. As the robber fled, he dropped "a

lot of cash," and the security guards picked up the cash as they followed him to prevent the customers from taking it. By the time the security guards got outside, Brown's truck was leaving the parking lot.

Within five minutes of the robbery and while he was in the parking lot, security guard Carlisle found a black cloth attached to a black mesh face mask (People's Exhibit 3) lying on the ground near where Brown's truck had been parked. [FN5] Security guard Thompson put on latex gloves before he picked up People's Exhibit 3, and then placed it inside a bag and sealed it. Deputy Sheriff Eric Keener received People's Exhibit 3 and sent it to the Department of Justice Crime Lab for DNA testing. Department of Justice Senior Criminalist Shawn Kacer, a DNA expert, took two swabs of the interior of the mesh face portion of People's Exhibit 3. The DNA in the epithelial skin cells found on the interior face portion of the mask matched the major DNA profile of defendant's known sample taken by Special Agent Raborn. Two human hairs that were also found on People's Exhibit 3 did not match defendant.

FN5. The prosecutor presented evidence the parking lot had been last cleaned the day before the robbery and there was no type of party at the casino on the night before the robbery. The defense brought out that there had been a Halloween party a week before the robbery during which costumed people were allowed in the casino and around the parking lot. However, since Halloween, the parking lot had been swept more than once every day.

The prosecutor also showed the jury the two videos created from casino surveillance camera footage. The videos captured the robbery and portions of the retrieval of the mask in the parking lot. The videos were first shown in their entirety, and then the jury was shown segments of the videos as certain witnesses were on the stand. The prosecutor paused the videos at certain intervals and asked the witnesses to describe what was happening in the video images. In the first video, the jury saw Brown's truck pulling into the casino parking lot just before the robbery; a shadow image of the robber getting out of the truck and running into the casino; Braget's Jeep pulling into the casino parking lot; the robber at the cash cage with a handgun demanding money; the robber running towards the front door of the casino; the robber dropping cash and the security officers picking it up as they followed the robber; the robber getting into Brown's truck after the robbery, and Braget at the window of the driver's side of Brown's truck then running beside the truck as it left the parking lot. In a second video, the jury saw images from the videotapes in four casino surveillance cameras that focused on the retrieval of the mask admitted as People's Exhibit 3. The jury saw security guard Thompson putting on a pair of latex gloves and then walking into the parking lot, his return to the casino holding a mask, his putting the mask in a plastic bag, sealing the bag, and giving the bag to Deputy Keener. The video does not show the security guard's actual retrieval of the mask from the casino parking lot.

**B.      Defendant's Case**

Defendant did not testify in his own behalf. He called defense witnesses and cross-examined the prosecution's witnesses to establish he was not the carjacker or robber.

Alibi witnesses testified defendant was at a friend's home at the time of the commission of the carjacking, kidnapping, and robbery. The prosecutor countered by presenting evidence indicating the witnesses may *not* have known where defendant was at the actual time of the carjacking, kidnapping, and robbery. Also, the prosecutor brought out inconsistencies between defense witnesses' trial testimony and statements they gave to Department of Justice officers who were investigating the casino robbery.

Defendant also sought to discredit the eyewitness testimony of Todd Braget. At the time of the trial Braget was almost 43 years old. During his twenties, he was convicted of a misdemeanor offense concerning a bad check, assault with a firearm, two counts of receiving stolen property, auto theft (twice), and escape from jail. Since his last conviction for escaping from jail in 1999, he had one drug conviction for which he participated in a program, and he had been sober for nine months at the time of trial. Also, a few years before the trial, Braget asked a woman to sign over her car to him to pay for drugs Braget had acquired for her. Braget threatened to choke the woman's cat if she did not sign over the car. The woman signed over the car, valued at about $2,500. Defense counsel also brought out the following evidence: Braget's perceptions at the time of the robbery were affected by his use of methamphetamine and marijuana earlier that evening. Braget admitted the casino surveillance video did not show defendant taking off the mask admitted as People's Exhibit 3. Braget had previously testified he only viewed defendant's face for "a second or two" after he tried to smash the truck's window, and at trial, Braget did not know exactly at what point he had seen defendant's face and exactly what made him remember it. Braget knew defendant's photograph was on the Sheriff Department's internet website before he identified defendant in the photographic array. [FN6]

FN6. Braget testified that before he identified defendant's photograph in the array he had never seen a photograph of the defendant, and although he knew before the identification that defendant's photograph was on the Sheriff Department's internet website, he never looked at the website photograph before he identified defendant's photograph in the array.

Finally, defendant sought to establish that People's Exhibit 3, the mask found in the casino parking lot, was not the mask worn by the robber as depicted in the casino surveillance video and a still photograph of the robber at the casino cash cage (Defendant's Exhibit E). People's Exhibit 3 was a black mesh face mask attached to black material that was shroud-like with pie-cut fringes. The surveillance video showed the robber's face covered only with a black mesh face mask, and his face is surrounded by purple material with pie cut fringe, and the purple material is covered in part by a

black hood. The People's witnesses confirmed the black mesh face mask portion of People's Exhibit 3, was, or was consistent with, the face mask worn by the robber. Defense counsel questioned some of the witnesses concerning the purple material surrounding the robber's face that was depicted in the surveillance video and still photograph. The witnesses readily admitted the surveillance video and still photograph showed the robber's face surrounded by purple material with pie cut fringes, which one witness described as looking "pretty close" to the "design and layout of... the outer part" of People's Exhibit 3. Braget testified the purple material was part of the hood, separate from the mask. The other witnesses did not know or could not definitely tell whether the purple material was a separate piece of material (a separate hood or sweatshirt), or attached to the black mesh face mask or the black hood covering the purple material.

Defendant also presented evidence the mask admitted as People's Exhibit 3, was available in both an all black version (People's Exhibit 3), and in a two tone version (Defendant's Exhibit K), and that both masks had been available for sale at a nearby Walmart during the Halloween season immediately before the robbery.

People v. Gillies, No. A121969, slip op. at 2-7 (Cal. Ct. App. Dec. 31, 2009) (Ans. Ex. 8).

DISCUSSION

I.      Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

United States District Court

For the Northern District of California

1   Court on a question of law or if the state court decides a case differently than [the]

2   Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529

3   U.S. 362, 412-13 (2000).  The only definitive source of clearly established federal

4   law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the

5   Supreme Court as of the time of the state court decision.  <u>Williams</u>, 529 U.S. at 412;

6   <u>Brewer v. Hall</u>, 378 F.3d 952, 955 (9th Cir. 2004).  While circuit law may be

7   "persuasive authority" for purposes of determining whether a state court decision is

8   an unreasonable application of Supreme Court precedent, only the Supreme Court's

9   holdings are binding on the state courts and only those holdings need be

10  "reasonably" applied.  <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir.), <u>overruled</u>

11  <u>on other grounds by</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003).

12        "Under the 'unreasonable application' clause, a federal habeas court may

13  grant the writ if the state court identifies the correct governing legal principle from

14  [the Supreme Court's] decisions but unreasonably applies that principle to the facts

15  of the prisoner's case."  <u>Williams</u>, 529 U.S. at 413.  "Under § 2254(d)(1)'s

16  'unreasonable application' clause, . . . a federal habeas court may not issue the writ

17  simply because that court concludes in its independent judgment that the relevant

18  state-court decision applied clearly established federal law erroneously or

19  incorrectly."  <u>Id.</u> at 411.  A federal habeas court making the "unreasonable

20  application" inquiry should ask whether the state court's application of clearly

21  established federal law was "objectively unreasonable."  <u>Id.</u> at 409.  The federal

22  habeas court must presume correct any determination of a factual issue made by a

23  state court unless the petitioner rebuts the presumption of correctness by clear and

24  convincing evidence.  28 U.S.C. § 2254(e)(1).

25        The state court decision to which Section 2254(d) applies is the "last

26  reasoned decision" of the state court.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-

27  04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there

28  is no reasoned opinion from the highest state court considering a petitioner's claims,

the court "looks through" to the last reasoned opinion.  See <u>Ylst</u>, 501 U.S. at 805.

Here, that opinion is from the California Court of Appeal.

Recently, the Supreme Court vigorously and repeatedly affirmed that under

AEDPA, there is a heightened level of deference a federal habeas court must give to

state court decisions.  See <u>Hardy v. Cross</u>, 132 S. Ct. 490, 491 (2011) (per curiam);

<u>Harrington v. Richter</u>, 131 S. Ct. 770, 783-85 (2011); <u>Felkner v. Jackson</u>, 131 S. Ct.

1305 (2011) (per curiam).  As the Court explained:  "[o]n federal habeas review,

AEDPA 'imposes a highly deferential standard for evaluating state-court rulings'

and 'demands that state-court decisions be given the benefit of the doubt.'"  <u>Id.</u> at

1307 (citation omitted).  With these principles in mind regarding the standard and

limited scope of review in which this Court may engage in federal habeas

proceedings, the Court addresses Petitioner's claim.

C.       <u>Claims and Analysis</u>

As grounds for federal habeas relief, Petitioner raises the following claims:

(1) ineffective assistance of counsel; and (2) juror bias.[2]

1.       <u>Ineffective Assistance of Counsel</u>

Petitioner's first claim is that defense counsel rendered ineffective assistance

by failing to review the Twin Pines Casino's surveillance tapes while preparing a

defense strategy.  Specifically, Petitioner claims that counsel failed to call as a

witness an expert in "forensic photography and image analysis" who would have

provided "exculpatory and impeachment evidence that the trier of fact was not

permitted to assess in their deliberations."  (Pet. Attach. at 6a.)

The Court of Appeal summarized this claim raised on direct appeal:

> In his petition, defendant argues that pivotal to his conviction
> or acquittal was whether People's Exhibit 3, on which defendant's
> DNA was found, was the mask worn by the casino robber. Although
> his status as the masked robber was extensively litigated at trial,

―――――――――――――

[2] This claim was originally identified as "jury tampering" in the Court's
Order to Show Cause, but is more properly addressed as a "juror bias" claim as
presented by Petitioner on direct appeal to the California Court of Appeal.

defendant contends his counsel's effort to persuade the jury to acquit him "was not enough." Defendant contends his counsel should have called as a witness a "forensic expert in image analysis and comparison," who would have established the mask seen in the surveillance video was not the mask admitted as People's Exhibit 3.

Attached to the petition is a declaration from Gregg Stutchman, the chief forensic analyst at Stutchman Forensic Laboratory. Stutchman reviewed the surveillance video and photographs of People's Exhibit 3. He also "conducted forensic enhancement/clarification" of the surveillance video by "captur[ing] the video footage from the DVD and prepar[ing] still images from individual frames and [using] imaging software to clarify" some of the still images. Copies of these still images are attached to the petition. Stutchman analyzed and compared a still image of the robber at the casino cash cage with photographs of People's Exhibit 3. He concluded "[t]he mask worn by the suspect at the cash cage is of a lavender color as compared to the mask in evidence which is black. The suspect is wearing a dark or black hood over the mask which is not connected to or part of the mask." If called as an expert witness in forensic image analysis, Stutchman would testify People's Exhibit 3 could not be the same mask worn by the robber in the surveillance video.

Also attached to the petition is a declaration from defendant's trial counsel, who sets forth his reasons for not calling an expert witness. "Shortly before the trial," defense counsel "became aware of, and considered using, a forensic video expert to conduct forensic image analysis and comparison of the surveillance video of the mask" worn by the robber and photos of People's Exhibit 3. However, counsel chose not to retain this expert because, to his best recollection, defendant did not waive any further time for jury trial and counsel felt the evidence "spoke for itself when closely studied: that the evidence, when viewed closely, would show that the mask worn by the perpetrator of the robbery in this case, as seen in the surveillance video, is not the same mask containing [defendant's] DNA."

(Ans. Ex. 8 at 13-14.)

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.

The <u>Strickland</u> framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  <u>See</u> <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1403 (2011).  A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.  <u>See</u> <u>id.</u> at 1410-11.  The general rule of <u>Strickland</u>, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." <u>Cheney v. Washington</u>, 614 F.3d 987, 995 (9th Cir. 2010) (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 788 (2011).

Applying <u>Strickland</u>'s highly deferential standard, the Court of Appeal rejected this claim:

> Contrary to defendant's contention, his trial counsel reasonably concluded it was not necessary to introduce the expert testimony proposed in Stutchman's declaration. "[T]he rationale for admitting opinion testimony is that it will assist the jury in reaching a conclusion called for by the case. 'Where the jury is just as competent as the expert to consider and weigh the evidence and drew the necessary conclusions, then the need for expert testimony evaporates.' [Citation.]" (*People v. Torres* (1995) 33 Cal.App.4th 37, 47.) Stutchman was prepared to testify People's Exhibit 3 was not the mask worn by the robber because the surveillance video showed only lavender material surrounding the robber's face, and the lavender material was not attached to the black hood covering the lavender material. However, the jurors were just as competent as the expert to compare the surveillance video and People's Exhibit 3 and drew the same self-evident conclusion. There was no question that the surveillance video only showed a lavender or purple material with pie cut fringes surrounding the robber's face and the surveillance video and the still photograph of the robber did not depict the black shroud-like material with pie cut fringes portion of People's Exhibit 3. Additionally, the expert's proposed testimony would not have contradicted or otherwise challenged the prosecution's position that the black shroud-like material with pie cut fringes portion of People's Exhibit 3 was hidden underneath the

United States District Court
For the Northern District of California

lavender or purple material depicted in the surveillance video and still photograph. Thus, even if the jurors in this case had heard the expert's proposed testimony, it is highly unlikely they would have reached a different outcome.

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland v. Washington, supra*, 466 U.S. at p. 689.) "'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*In re Visciotti, supra*, 14 Cal.4th at p. 352, quoting *Strickland v. Washington, supra*, 466 U.S. at p. 686.) On this record, defendant has failed to set forth a prima facie showing the verdict was"rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance." (*Strickland v. Washington, supra*, 466 U.S. at p. 700.) Accordingly, we summarily denied the petition for writ of habeas corpus.

(Ans. Ex. 8 at 14-15.)

Petitioner's claim is without merit.  First of all, Petitioner fails to show that counsel's failure to call an expert witness falls below an "objective standard of reasonableness" under prevailing professional norms.  <u>Strickland</u>, 466 U.S. at 687-88.  According to his declaration, counsel had rational reasons for not calling an expert witness which included the fact that Petitioner did not waive any further time for jury trial and because counsel felt the evidence "spoke for itself" such that expert testimony would be superfluous.  <u>See</u> <u>supra</u> at 9.  Where the evidence does not warrant it, the failure to call an expert does not amount to ineffective assistance of counsel.  <u>See</u> <u>Wilson v. Henry</u>, 185 F.3d 986, 990 (9th Cir. 1999).  Counsel reasonably believed that the jury would be able to make the distinction regarding the contested mask evidence, i.e., People's Exhibit 3, on their own:  "the evidence, when viewed closely, would show that the mask worn by the perpetrator of the robbery in this case, as seen in the surveillance video, is not the same mask containing [defendant's] DNA."  <u>Id.</u>  The surveillance videos were shown to the jury several times, once in their entirety and again as different witnesses were called.  <u>See</u> <u>supra</u> at 3-4. Furthermore, counsel extensively cross-examined witnesses about the

United States District Court

For the Northern District of California

apparent differences in the appearance of the mask which was worn by the robber and People's Exhibit 3: the carjacking victim Patrick Brown and two casino employees Dorothy Davis and Cynthia Greenwood all testified that they did not recall the purple part of the mask, (Reporter's Transcript ("RT") 265-268, 287-288, 344-345; Travis Park, the casino security guard, recollected seeing purple, (RT 313); and John Thompson, the casino security guard who picked up the mask in the parking lot, agreed that the mask in the video and People's Exhibit 3 looked different, (RT 457-458). Counsel also established that a nearby Walmart had sold masks similar to the one found in the parking lot around Halloween and that there had been a Halloween party at the casino a week before the robbery. Lastly, counsel emphasized in his closing argument that the mask worn by the robber was different from People's Exhibit 3: "One thing is absolutely clear, however, leaving all that aside, it was a two-toned mask the guy was wearing. The fringe is there. It proves up that's what it was. The perp's mask is not the black one in evidence, that's all there is to it." (RT 682-683.) Accordingly, counsel's conduct with respect to the mask evidence did not fall below an objective standard of reasonableness.

Secondly, Petitioner cannot show that he was prejudiced by counsel's conduct because there was no reasonable likelihood that the jury would have reached a different verdict even if the expert's testimony had been presented at trial. In denying Petitioner's motion for a new trial based on the new expert testimony, the trial court concluded that there was overwhelming evidence that strongly supported the conclusion that the mask found in the parking lot minutes after the robbery, which contained Petitioner's DNA, was the same mask worn by the robber:

> The thrust of defense contentions is that the mask that was worn on the day in question necessarily had some sort of purple of reddish-colored fringe on it that was an inherent and integral part of that mask. I would note having had the occasion to examine, as did the jurors – the tapes were played time and time again – it was abundantly clear that it wasn't exactly whether or not the – the colored portion was a part of the black mask with a webbing, sometimes referred to as a green mask – I guess from the movie of the name – or whether it was a separate hooded vest or a shawl or

1   something else.

2       But all of that to some extent becomes immaterial even if they
    could be further enhanced in that parking lot on the day in question.
3   Within virtually minutes after the event there was found a black
    mask, that has been abundantly identified before the jury and to the
4   Court, that contained the DNA deposit from the defendant; that to a
    scientific degree proves to the extent of 1 septillion, I believe it is,
5   "1" followed by 21 zeros over "1", that he's the guy that did it. It
    was his DNA. That didn't just mysteriously fly down out of space
6   and land in that parking lot within minutes after the event.

7       And indeed, we have Mr. Braget from his vantage point being
    able to see the defendant rip the mask off his head and drop it into
8   the parking lot before he got into the stolen truck. We also have Mr.
    Braget's ID as well.

9
        But the astronomical odds that that mask somehow or another
10  was not the defendant's is too much for the Court to accept. It is so
    strong and so overwhelming as a matter of evidence, that the rest of
11  this seems to be conjectural at best and an unhappy, but vain attempt
    to get the Court to continue this matter yet another time as we had at
12  first, and I'm not inclined to do that.

13      The overwhelming force of the evidence abundantly supports
    the jury's verdict and the Court, of course, had the same option that
14  the jury did to view the evidence and listen to the testimony and hear
    the convincing force. And we are not going to be continuing this
15  proceeding and we're not going to be granting a new trial.

16  (RT 669-770.)

17      As discussed by the trial court, there was extensive evidence indicating that

18  the mask found in the parking was the same mask worn by the robber,

19  notwithstanding the lack of additional colored material.  Furthermore, Petitioner's

20  attempt to suggest that the mask found in the parking lot was a remnant from a

21  Halloween party that took place the week before was also unconvincing because

22  there was evidence that the parking lot had been cleaned the day before and swept

23  more than once every day since the party.  See supra at 5.  In light of the weight of

24  evidence against Petitioner, it was not likely that the expert witness's testimony

25  would have changed the jury's verdict.   Accordingly, the state courts' rejection of

26  this claim was not contrary to, or an unreasonable application of, Supreme Court

27  precedent.  28 U.S.C. § 2254(d).

28  ///

2.      Juror Bias

Petitioner's second claim is that his right to trial by an impartial jury was violated when spectator conduct may have caused a juror to be biased.[3]

The Court of Appeal summarized what occurred at trial:

A.      Relevant Facts

In its opening instructions, the court admonished the jurors they were not to "listen to anyone who tries to talk to you about the case or about any of the people or subjects involved in it. Sometimes during a break, you might be out in the hall and someone will come up and maybe start discussing the case in your presence. Just leave it or tell them to cut it off or steer clear of them the best you can, and let me know if anyone is persistent so I can deal with it. [¶] Again, if someone asks you about the case, tell him or her you cannot discuss it. If that person keeps talking about the case, please end the conversation. It does happen, and it's led to mistrials, and we need to go over and do this all again. I don't want to do that." The court also admonished the jurors, "If you receive any information about this case from any source outside the trial, even unintentionally, someone blurts out something in your presence or the like, do not share that information with any other juror. If you do receive such information or anyone tries to influence you or any juror, you must immediately tell the bailiff."

Following opening statements and the testimony of two prosecution witnesses, the court recessed for lunch. After the recess, the court convened in chambers with both counsel but outside the presence of defendant and the jurors. The court bailiff reported he had been approached by juror number 10 who had heard someone say, "he's innocent." The bailiff advised the juror not to go into the jury room or mention the matter to the other jurors because it was possible the court would inquire about the matter after the trial resumed. The court told counsel it would talk to the juror and then assess if the remaining jurors should be questioned in case they had been similarly approached or things were yelled out in their presence.

In chambers, juror number 10 was questioned by the court, the prosecutor, and defense counsel. [FN7] The court asked the juror to explain what had happened during the lunch recess. The juror stated that right after the court recessed for lunch and as she was walking to lunch, she saw two women whom she recognized as spectators in the courtroom that morning. As soon as the two women passed the juror, "one of them said, 'he's innocent,' like it was obvious." The juror was maybe five to ten feet away from the

---

[3] The trial court interviewed four jurors who reported spectator misconduct during two separate incidents. The Court need only address whether the trial court properly retained juror number 10 as Petitioner did not challenge the retention of the other jurors on appeal.

woman when the comment was made. The juror was not absolutely sure the comment was directed at her but she was "pretty sure" it was intended she hear it. The juror first thought the woman was just stating an opinion to her friend, but then it seemed like it was loud enough so the juror would obviously hear the comment.

FN7. The court also questioned three other jurors regarding unrelated incidents that occurred outside the courtroom during the same lunch recess. One juror was approached at lunch by someone who said, "Be nice to my friend," and two jurors heard courtroom spectators yelling, "He's innocent," and were followed to the parking lot and watched by the spectators as they got into their cars. Because defendant does not challenge the retention of these three jurors, their in chambers interviews are not recounted or otherwise addressed in this opinion.

The prosecutor asked the juror if there was anything intimidating about the incident. The juror replied, "Yeah, I was kind of upset that they were trying to intimidate me." When the court asked, "Is that to the point that you feel uncomfortable sitting as a juror in this case," the juror replied, "No, I don't' think so. One thing I do feel a little uncomfortable about at least, the defendant was in the courtroom, and he knows where I live, where our business is...." In response to a series of questions by the court as to how defendant would know that information, the juror replied the court had earlier questioned her about the location of her business in defendant's presence. After further questioning, the juror confirmed she had never seen defendant before, he had never been a customer of her business, and there were a lot of different resorts in the location of her business "[s]o it's not something that really bothers me a lot." "It was just something that went through my mind."

When the prosecutor asked if the juror felt she needed to tell the court anything else before she resumed her jury duties, she replied, "No. And like I said, when I first heard it, I thought, oh, they're just talking to themselves. And then when I thought about it for another few seconds, I thought they were probably intending it for me." Defense counsel asked the juror if she could still be fair to defendant. The juror first stated, "I'm feeling like part of me thinks that if – I think I could." When the court asked the juror to complete the first part of her statement, the juror replied: "Part of me is thinking that if this is the kind of family he comes from that's trying to influence the jury, then I guess that makes it a little bit of an influence on me." The court replied, "just for what it's worth, none of those people are his family." To which the juror responded, "Okay. Then that would not be as much – that wouldn't be an influence then." The court added, "And we will likely be having a chat with them." In response to further questions by the court and prosecutor, the juror assured the court that if a similar event happened regarding anybody from either side, she would feel comfortable reporting the matter to the court. The court told the juror sometimes people on both sides of a case say stupid things, and then asked the juror if she could put that aside and look at the facts. The juror replied, "Yes." The court responded, "I think you can too." The

court thanked the juror and told her not to discuss the matter with the other jurors.

After juror number 10 left the court's chambers, the court commented it did not believe the juror feels "intimidated in that sense." The court asked if counsel had anything to put on the record, and if not, the court asked defense counsel to talk with the courtroom spectators about their conduct and that if there was any further conduct, the court would recommend they be considered for prosecution for jury tampering. When the court indicated the trial would resume, the following colloquy took place. "[Defense Counsel]: I just want to make one comment. I did have a little bit of concern about juror 10. She seemed like she's saying, you know, maybe she did feel a little intimidated and maybe she was starting to have bias towards the defendant, that's all. [¶] [Prosecutor]: This is certainly nothing that the People had anything to do with in any way. [¶] [Defense Counsel]: That's not what I'm saying. [¶] [Prosecutor]: And you're allowing the defendant to kind of reshape the jury now. [¶] [Defense Counsel]: No, your Honor.... [T]he defendant is in custody. He had nothing to do with it. [¶] The Court: That's an awkward position, because if I readily permit people to be intimidated and thereby opt them off the jury – not that you would have anything to do with that directly. I don't think that for a minute, [defense counsel].... [¶]...[¶] But if... defendants feel they can get away with that, then they have the ability to reshape the jury, and that's not right either." The discussion then turned to whether defendant could have been involved in any misconduct by the courtroom spectators, ending with the court asking both counsel to remain after the jury was dismissed that day to 'try and reflect on it. We may have to attack it in the morning." The record does not reflect the matter was ever raised by the court or counsel at any time thereafter.

(Ans. Ex. 8 at 7-10.)

The Court of Appeal rejected this claim first as being forfeited based on

Petitioner's failure to raise an objection at trial and then also on the merits:

Defendant argues he is entitled to a new trial because juror number 10 may have been biased against him. We conclude the issue is not properly before us, and, in any event, lacks merit.

Defendant forfeited his claim of juror bias by failing to ask the trial court to take any action concerning the retention of juror number 10. After receiving the bailiff's report that juror number 10 had heard someone say, "he's innocent," the court investigated the facts in the presence of counsel to determine whether what the juror heard "'was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial....'" (*People v. Chatman* (2006) 38 Cal.4th 344, 369, quoting *Holbrook v. Flynn* (1986) 475 U.S. 560, 572.) After questioning the juror, the court stated its position regarding the matter, and asked if counsel had anything to put on the record. After defense counsel stated his concerns about

**United States District Court**

For the Northern District of California

juror number 10, nothing prevented him from immediately asking the court to declare a mistrial or substitute an alternate juror for juror number 10. Had a request been made, there were alternate jurors available for substitution. Consequently, defendant may not now complain about the court's decision to leave juror number 10 on the jury. (*People v. Panah* (2005) 35 Cal.4th 395, 480 [claim for juror bias caused by conduct of defendant's family members was forfeited by failure to request any action in trial court].)

Defendant's argument that his trial counsel was ineffective for failing to challenge the trial court's decision to retain juror number 10 is unavailing. "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, [reviewing courts] will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.) Contrary to defendant's contention, this is the usual case. Defense counsel could reasonably have decided that a mistrial or removal of juror number 10 was not in his client's interest, but a comment on what appeared to be equivocal responses by juror number 10 was appropriate in case any further attempt was made to interfere with the juror. On this record, we see no reason to "second-guess[] trial counsel's tactical decision to leave [juror number 10] on the jury." (*People v. Majors* (1998) 18 Cal.4th 385, 428.)

Even if the matter was properly before us, we are not persuaded by defendant's argument that juror number 10 communicated, in different ways, she was actually biased against him. "What the record seems to indicate is [misconduct by a spectator]... who, intentionally or not, made [herself] conspicuous... in a manner that [juror number 10] interpreted as intimidating. The juror['s] understandable concern does not amount to misconduct, and there is nothing on the record to support defendant's claim that he was denied an impartial jury." (*People v. Panah, supra,* 35 Cal.4th at p. 480; see *People v. Navarette* (2003) 30 Cal.4th 458, 499-500 [no error where trial court took appropriate and sufficient steps to address seated juror's concerns "for property and family" as it related to defendant's possible access to jurors' questionnaires].) The trial court here found juror number 10 was not intimidated by the spectator's comment, and that the juror would be able to put aside the spectator's comment, and look at the facts of the case. To the extent defendant asks us to consider other statements made by the juror, "[w]e defer to the trial court's determination of the state[] of mind of the[] juror[] in the face of conflicting or equivocal answers to questions concerning impartiality. [Citations.]" (*People v. Morris* (1991) 53 Cal.3d 152, 186 fn. 4, disapproved on other grounds by *People v. Stansbury* (1995) 9 Cal.4th 824, 830 fn. 1.) An independent review of the record does not establish "a substantial likelihood the juror was biased or that [the spectator's comment] impermissibly influenced her to the defendant's detriment." (*In re Carpenter* (1995) 9 Cal.4th 634, 656.)

(Ans. Ex. 8 at 10-12.)

The Sixth Amendment guarantees to the criminally accused a fair trial by a

United States District Court

For the Northern District of California

1    panel of impartial jurors.  U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717,

2    722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is

3    denied his constitutional right to an impartial jury."  Tinsley v. Borg, 895 F.2d 520,

4    523-24 (9th Cir. 1990) (internal quotations omitted).  The Ninth Circuit has

5    recognized that to disqualify a juror for cause requires a showing of actual bias or

6    implied bias, that is "bias in fact, or bias conclusively presumed as a matter of law."

7    United States v. Gonzalez, 214 F.3d 1109, 1111-12 (9th Cir. 2000).

8         However, the Constitution "does not require a new trial every time a juror has

9    been placed in a potentially compromising situation."  Smith v. Phillips, 455 U.S.

10   209, 217 (1982).  The safeguards of juror impartiality, such as voir dire and

11   protective instructions from the trial judge, are not infallible; it is virtually

12   impossible to shield jurors from every contact or influence that might theoretically

13   affect their vote.  Id.  Due process only means a jury capable and willing to decide

14   the case solely on the evidence before it and a trial judge ever watchful to prevent

15   prejudicial occurrences and to determine the effect of such occurrences when they

16   happen.  Id.

17        Juror bias is a question of historical fact; that is, bias turns on what the juror

18   said and did and whether the juror's statement that he or she could be impartial was

19   credible.  Patton v. Yount, 467 U.S. 1025, 1036 (1984).  In order to receive relief

20   based on factual determination, petitioner must show that the state court's

21   adjudication "resulted in a decision that was based on an unreasonable determination

22   of the facts in light of the evidence presented in the State court proceeding."  28

23   U.S.C. § 2254(d)(2).  A state court decision "based on a factual determination will

24   not be overturned on factual grounds unless objectively unreasonable in light of the

25   evidence presented in the state-court proceeding."  Miller-El, 537 U.S. at 340.  A

26   trial court's determination of juror bias is given "special deference," both on direct

27   appeal and in habeas proceedings, because juror bias is largely a function of the

28   credibility of the juror.  Patton, 467 U.S. at 1038.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Assuming that the issue was not procedurally defaulted, Petitioner's claim is nevertheless without merit because the state court's decision was not objectively unreasonable in light of the evidence presented.  Miller-El, 537 U.S. at 340.  During the in chamber proceedings, the trial court and parties were able to thoroughly question the juror on the impact of the spectator's comment on her ability to remain impartial.  See supra at 15-16.  Based on her responses, the trial court did not believe that juror number 10 was intimidated in such a way that it would influence her ability to serve on the jury.  The state appellate court properly deferred to the trial court's determination that the juror would be able to "put aside the spectator's comment, and look at the facts of the case."  See supra at 17; Patton, 467 U.S. at 1038.  Furthermore, whether a juror is actually biased is a question of fact, see Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc), and therefore the state court's determination that juror number 10 was not biased is presumed correct under 28 U.S.C. § 2254(d)(2).  Petitioner has failed to rebut this presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Lastly, since there is no Supreme Court precedent that controls on the issue of the potentially prejudicial effect of spectator's courtroom conduct, the state court's decision rejecting Petitioner's claim cannot be contrary to, or an unreasonable application of, clearly-established federal law.  See Carey v. Musladin, 549 U.S. 70, 77 (2006); see, e.g., id. at 76-77 (given the lack of holdings from the Supreme Court and the wide divergence of the lower courts on the issue of the potentially prejudicial effect of spectators' courtroom conduct, the California Court of Appeal's determination that the petitioner was not inherently prejudiced by spectators wearing buttons depicting the murder victim was not contrary to or an unreasonable application of clearly established Supreme Court law).  Accordingly, this claim is denied as without merit.

///

///

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

IT IS SO ORDERED.

DATED: _____3/29/2013_____



EDWARD J. DAVILA
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


JOHN A. GILLIES,

               Petitioner,

  v.

G. SWARTHOUT, Warden,

               Respondent.
_____/

Case Number: CV11-02097 EJD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on _____4/1/2013_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


John A. Gillies G-22170
CSP -Solano
2100 Peabody Rd.,
Vacaville, CA 95696


Dated: _____4/1/2013_____

                              Richard W. Wieking, Clerk
/s/ By: Elizabeth Garcia, Deputy Clerk